James L. Buchal, OSB: 92161
MURPHY & BUCHAL LLP
2000 S.W. First Avenue, Suite 420
Portland, OR  97201
jbuchal@mbllp.com
Telephone:  503-227-1011
Facsimile:  503-227-1034

Attorney *Pro Hac Vice* for Plaintiff
Homer T. McCrary

Andrea M. Miller, SBN: 88992
NAGELEY, MEREDITH & MILLER, INC.
8001 Folsom Blvd., Suite 100
Sacramento, CA  95826
amiller@nmlsawfirm.com
Telephone:  916-386-8282
Facsimile:  916-386-8952

Attorney for Plaintiff
Homer T. McCrary

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| HOMER T. MCCRARY,<br><br>                    Plaintiff,<br><br>          v.<br><br>CARLOS M. GUTIERREZ, *et al*.,<br><br>                    Defendants. | Case No. C 08-CV-1592-RMW<br><br>PLAINTIFF'S COMBINED OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT<br><br>Date:     November 21, 2008<br>Time:     9:00 a.m.<br>Judge:    Hon. Ronald W. Whyte<br>          Courtroom 6, 4th Floor |

# TABLE OF CONTENTS

Summary of Argument ................................................................................................. 1

Argument ...................................................................................................................... 3

I.      COUNTERSTATEMENT OF THE STATUTORY AND
        REGULATORY CONTEXT FOR CONSIDERATION OF THE
        PETITION:  THE ESA IS NOT ABOUT PROTECTING POORLY-
        LOCATED HATCHERIES ................................................................................ 3

II.     THE PETITION MADE A VERY SUBSTANTIAL CASE THAT COHO
        HAVE NEVER ESTABLISHED NATURALLY SELF-SUSTAINING
        POPULATIONS SOUTH OF SAN FRANCISCO, AND NEVER WILL ........... 6

        A.      The Lack Of Archaeological Evidence Indicates That The
                Petitioned Action *May Be Warranted* ................................................ 7

        B.      NMFS Ignores Effects On Listed Native Steelhead, Which *May
                Warrant* Full Consideration Of The Petition .................................... 8

        C.      Unanimous Professional And Popular Opinion Prior To 1906
                Indicates That The Petitioned Action *May Be Warranted* ................ 9

        D.      The Physical Differences South Of San Francisco Indicate That
                The Petitioned Action *May Be Warranted* ...................................... 11

        E.      The Repeated Hatchery Failures Indicate That The Petitioned
                Action *May Be Warranted* ................................................................ 12

III.    THE PETITION DEMONSTRATED DEFENDANTS' FAILURE TO
        EXERCISE LISTING AUTHORITY CONSISTENT WITH THEIR
        OWN ESU POLICY ...................................................................................... 13

IV.     DEFENDANTS MAY NOT INVOKE GENETICS DATA TO EXCUSE
        NONCOMPLIANCE WITH THE ESU POLICY .......................................... 19

        A.      Genetics Evidence Can Play No Controlling Role In ESU
                Definition ........................................................................................... 20

        B.      The Available Genetics Data Cannot Rationally Be Used To Draw
                Any Particular ESU Boundary ............................................................ 23

                1.      Genetics data cannot infer historical presence ......................... 23

                2.      Asserted "genetic similarity" between south of San
                        Francisco coho and other coho does not compel any
                        particular ESU ......................................................................... 24

Conclusion ................................................................................................................. 30

i

1

<div align="center"><b>TABLE OF AUTHORITIES</b></div>

2

**Cases**

3

*Alsea Valley Alliance v. Evans*,
    161 F. Supp.2d 1154 (D. Or. 2001)
    *appeal dismissed*, 358 F.3d 1181 (9th Cir. 2004) ............................................ 3

4

5

*American Iron and Steel Institute v. EPA*,
    115 F.3d 979 (D.C. Cir. 1997) ............................................ 11

6

*Appalachian Power Co. v. EPA*,
    135 F.3d 791 (D.C. Cir. 1998) ............................................ 11

7

8

*Cactus Corner, LLC v. USDA*,
    450 F.3d 428 (9th Cir. 2006) ............................................ 6

9

*California State Grange v. NMFS*,
    No. 06-CV-0308 (lead), (E.D. Cal. Oct. 27, 2008) ....................... 4, 21, 22

10

11

*Central Coast Forest Ass'n v. California Fish & Game Comm'n*,
    No. 05CS01617, (Sac. Cty. Sept. 22, 2006) ............................................ 9

12

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971) ............................................ 5

13

14

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
    509 U.S. 579 (1993) ............................................ 18

15

*Hells Canyon Preservation Council v. Jacoby*,
    9 F. Supp.2d 1216 (D. Or. 1998) ............................................ 22

16

17

*Maine v. Norton*,
    257 F. Supp.2d 357 (D. Me. 2003) ............................................ 14, 21

18

*Moden v. U.S. Fish and Wildlife Service*,
    281 F. Supp.2d 1193 (D. Or. 2003) ............................................ 2, 7

19

20

*Motor Vehicle Ass'n v. State Farm Mutual Auto Ins. Co.*,
    463 U.S. 29 (1983) ............................................ 9, 13

21

*Northwest Environmental Defense Center v. BPA*,
    477 F.3d 668 (9th Cir. 2007) ............................................ 7, 13, 20

22

23

*SEC v. Chenery*,
    318 U.S. 80 (1947) ............................................ 29

24

*Southwest Center for Biological Diversity v. U.S. Forest Service*,
    100 F.3d 1443 (9th Cir. 1996) ............................................ 22

25

26

*The Lands Council v. McNair*,
    537 F.3d 981 (9th Cir. 2008) ............................................ 6, 12

27

*Trout Unlimited v. Lohn*,
    No. CV06-0483-JCC, 2007 WL 1730090 (W.D. Wash. June 13, 2007)
    *appeal docketed* ............................................ 4

28

**Federal Statutory Provisions**

16 U.S.C. § 1532(16) ............................................................... 17

16 U.S.C. § 1533(b)(1)(A) .......................................................... 6

50 C.F.R. § 424.14(b)(1) ................................................. 1, 6, 7, 10

**Other Authorities**

56 Fed. Reg. 58,612 (Nov. 20, 1991)........................................*passim*

60 Fed. Reg. at 38,011 (July 25, 1995) ........................................ 26

61 Fed. Reg. 4,722 (Feb. 7, 1996).............................. 14, 16, 17, 21

70 Fed. Reg. 37,160 (June 28, 2005) ........................................... 12

NRC, *Science and the Endangered Species Act* 44 (Nat'l Academy Press 1995)............ 22

**Summary of Argument**

1

2        This is not a case to determine whether or not coho salmon south of San Francisco should be

3    listed under the Endangered Species Act.  The issue for determination is whether the amount of

4    information presented in the Petition "would lead a *reasonable person* to believe that the measure

5    proposed in the Petition may be warranted".  50 C.F.R. § 424.14(b)(1) (emphasis added).  The

6    Petition, as amended and supplemented, more than adequately demonstrated that the geographic

7    scope of the listing of California coho salmon should be adjusted to exclude areas south of San

8    Francisco, where the coho persist in non-native habitat solely by virtue of constant hatchery

9    operations.

10       We first review the statutory context of the dispute, in which defendants were supposed to

11   exercise their authority to list "distinct population segments" only sparingly, and instead have

12   declared that "every population of coho salmon needs to be included in some coho salmon ESU".

13   (AR1846.)  We demonstrate that the focus of the ESA is on restoring naturally self-sustaining

14   populations in their native habitat.  While defendants would disparage plaintiff and the Petition as

15   some sort of attempt to frustrate the workings of the ESA for economic gain, the Petition in fact

16   continues plaintiff's longstanding efforts to protect native steelhead in native steelhead habitat from

17   ill-considered and hopeless coho hatchery operations that have no business operating south of San

18   Francisco.  It is plaintiff who seeks to advance the purposes of the ESA to protect *fish*; it is

19   defendants that seek to preserve *fish programs* inimical to those purposes.

20       There is no dispute that the coho hatchery efforts over more than a century have failed to

21   establish self-sustaining coho populations.  There is no dispute that every fisheries professional,

22   fishing guide and newspaper reporter regarded coho salmon as not native to the area when

23   introduced in 1906.  There is no dispute that the peculiarities of habitat (scouring flows from large

24   storms and sand bars blocking migration) make the habitat south of San Francisco hostile to coho;

25   as defendants characterize it, the dispute is whether "these habitat differences south of San

26   Francisco are significant enough to preclude coho salmon presence . . ." (AR1845.)

27       Ultimately, defendants can only complain that the Petition fails to demonstrate

28   "conclusively" and "definitively" that action was required.  Reviewing courts, however, have

PAGE 1:    PLAINTIFF'S COMBINED OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY
           JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
           Case No. 08-CV-1592-RMW

emphasized that "the standard for evaluating whether substantial information has been presented by a 'interested person' is not overly-burdensome, does not require conclusive information, and uses the 'reasonable person' to determine whether substantial information has been presented to indicate that the action may be warranted". *Moden v. U.S. Fish and Wildlife Service*, 281 F. Supp.2d 1193, 1204 (D. Or. 2003) (reversing threshold rejection of sucker delisting Petition). In dismissing the multiple, independent lines of evidence advanced by plaintiff to show that coho are not able naturally to survive south of San Francisco as not "definitive" or "conclusive", defendants manifestly applied the wrong legal standard.

Quite apart from demonstrating the impossibility of establishing naturally self-sustaining populations in the area, the Petition, as supplemented, also demonstrated that protection of populations south of San Francisco was inconsistent with defendants' ESU Policy. Above all else, that Policy requires that listed populations be "an important component in the evolutionary legacy of the species," a requirement defendants elsewhere recognize addresses Congressional concern that the listing authority should be used "sparingly". (*See* AR1037.) If the handful of fish that result from pouring scarce coho genetic resources into the sinkhole south of San Francisco are deemed to be "an important component in the evolutionary legacy" of a species that stretches around the Pacific, this requirement will have been reduced to meaninglessness.

Ultimately, defendants retreat to the most arcane of defenses fashioned from tiny differences in microsatellite gene frequencies in sampled coho, which they claim "alone provides a rational basis for NMFS' petition finding". (Dfts. Mem. 15.) But the record—and other judicial decisions concerning the ESU Policy—confirm that arcane gene frequency measurements have very little to do with species definition. Properly understood, the information obtained from microsatellite gene frequencies tells defendants nothing about where, as a policy matter, they should draw the line between listed "species" and populations that do not merit listing. We demonstrate that available information concerning coho genetics, while interesting and complex, does not assist defendants in the line drawing process, as it does not identify where in the hierarchy of population structure the

1  ESU line should be drawn:  whether on the Canadian border, state borderlines, lines within states,

2  river by river, or tributary by tributary.

3       There is no reason to commit the increasingly scarce resources of the Federal government to

4  the same experiment that has failed for more than century:  trying to grow coho salmon in an area

5  where they cannot possibly thrive, adversely affecting the genuinely-native listed steelhead

6  petitioner has long sought to protect.  Plaintiff's motion for summary judgment should be granted,

7  so that defendants may proceed to a more careful status review of the issues presented, and

8  hopefully avoid such utter waste.

9                                    **Argument**

10  **I.     COUNTERSTATEMENT OF THE STATUTORY AND REGULATORY CONTEXT
         FOR CONSIDERATION OF THE PETITION:  THE ESA IS NOT ABOUT
11       PROTECTING POORLY-LOCATED HATCHERIES.**

12       In a way, defendants have utterly inverted the Congressional design of the Endangered

13  Species Act.  The Act was intended to be limited to those few circumstances where an entire species

14  was in danger of disappearing from the face of the earth, which is not remotely likely in the case of

15  coho, which can be purchased in any supermarket for a few dollars a pound.  *See generally* AR43

16  (coho "are widely distributed in commercially harvestable quantities throughout their natural range,

17  from the Soviet Far East around the Bering Sea, to Alaska, and south along the North American

18  coast to California").  Congress did provide authority to list "distinct population segments", to be

19  used "sparingly" in those cases where a species might disappear entirely from the United States, or

20  "conclusive data is available with regard to only certain populations".  *See generally Alsea Valley*

21  *Alliance v. Evans*, 161 F. Supp.2d 1154 (D. Or. 2001) (reviewing legislative history), *appeal*

22  *dismissed*, 358 F.3d 1181 (9th Cir. 2004).

23       Instead of using its "distinct population segment" authority "sparingly", defendants have

24  reframed this statutory term as an "evolutionarily significant unit" (ESU), adopted an ESU Policy to

25  guide listing decisions, and then listed nothing but ESUs for Pacific salmon.  Most shockingly, in

26  rejecting the Petition, defendants declared that "every population of coho salmon needs to be

27  included in some coho salmon ESU".  (AR1846.)  *In other words, every population of coho salmon*

28

1    *anywhere must be deemed to meet the statutory requirements for listing.* This is a position

2    untethered to either the statute or the ESU policy.

3        Defendants correctly state that there is no dispute that the coho south of San Francisco are at

4    "the highest risk of extinction" (Dfts. Mem. 30), but the ESA requires more than identifying any

5    group of animals at risk of extinction. The statute is aimed at preserving "naturally self-sustaining

6    populations in their naturally-occurring habitat". *Trout Unlimited v. Lohn*, No. CV06-0483-JCC,

7    2007 WL 1730090 (W.D. Wash. June 13, 2007), *appeal docketed*. A very recent 168-page opinion

8    in the Eastern District has affirmed NMFS' treatment of hatchery fish in the steelhead listing

9    context, explaining that:

10        "NMFS reasonably interpreted the ESA to allow, *if not require*, that emphasis be
placed on natural (i.e., "wild") populations of species being considered for listing.

11        Most importantly, the ESA requires that the condition of listed species (or DPSs)
be improved so that they will no longer need the protection of the ESA. The

12        reasonable implication of this requirement is that agencies should aim recovery
efforts toward establishing self-sustaining populations. An interpretation that

13        would permit exclusive reliance on hatcheries for 'recovery' purposes is
antithetical to the creation of a self-sustaining population."

14

15    *California State Grange v. NMFS*, No. 06-CV-0308 (lead), slip op. at 79 (E.D. Cal. Oct. 27, 2008)

16    (emphasis added).

17        Here, NMFS is pursuing a listing that is entirely antithetical to the fundamental purposes of

18    the ESA, by insisting upon listing imported fish that cannot possibly survive in hostile and non-

19    native habitat, and which can persist only by continuously strip-mining populations to the north for

20    hatchery broodstock. This not only operates to the detriment of more northerly stocks, but also to

21    the detriment of the native steelhead south of San Francisco with which introduced coho compete.

22        Defendants insist also, in substance, that the fundamental factual problems raised by the

23    Petition are essentially irrelevant as a matter of law, because they have defined a Central California

24    Coast ESU, they have defined the fish south of San Francisco to be part of it, and "NMFS cannot

25    simply carve out this portion of an endangered ESU and exclude it from ESA protection". (Dfts.

26    Mem. 25.) That is sophistry. It is scarcely credible for an agency that asserts immense power and

27    discretion to define "species" by reference to such vague terms as "isolation" and "importance" to

28

PAGE 4:     PLAINTIFF'S COMBINED OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY
JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
Case No. 08-CV-1592-RMW

claim that it lacks power to draw *any different line whatsoever* in defining appropriately-listed ESUs, and the California court properly has rejected this same argument when advanced by the California listing authorities.[1]  Defendants plainly have, and should exercise, authority to draw a line that does not include the coho south of San Francisco in a more northerly ESU.

Defendants do not dispute that coho salmon, *as a species*, are in no danger whatsoever of extinction, or that their listing authority to protect smaller subsets of fish (ESUs or DPSs) is to be exercised "sparingly".  In an effort to bolster their position, defendants recite at length all of their extensive administrative proceedings, but do not dispute that such proceedings somehow overlooked virtually all the data assembled by plaintiff in the Petition.  In those proceedings, defendants determined, in substance, to put all coho salmon in one ESU or another under their conception that "every population of coho needs to be included in some coho salmon ESU" (AR1846) and listed, and then arbitrarily set geographic boundaries for such ESUs.  The lack of "disagreement" among fish managers (see Dfts. Mem. 8) with respect to this "list everything" approach cannot overcome the unlawfulness of the decision here.

Nor is it appropriate to apply a high degree of deference to defendants' rejection of the Petition.  Defendants urge the Court to apply a standard of review that would "defer to the evaluations of agencies when the evidence presents conflicting views".  (Dfts. Mem. 14 (quoting *Cactus Corner, LLC v. USDA*, 450 F.3d 428, 435 (9th Cir. 2006) and *The Lands Council v. McNair*, 537 F.3d 981, 993 (9th Cir. 2008)).   A "searching and careful" inquiry into the facts required under the Administrative Procedure Act, *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), demonstrates that the *evidence* does not really present conflicting views concerning the core of the Petition's case:  there is no dispute that one hundred years of hatchery efforts have failed to establish self-sustaining populations, and the habitat south of San Francisco is recognized by the agency itself to be hostile to coho.  Defendants' rejection of the Petition is not rooted so much in a

---

[1] Petitioner is baffled by defendants' motion to strike the two California cases overturning rejection of an almost identical petition, which, as *cases*, are not subject to a motion to strike.  Defendants' position goes, as it were, to weight and not to admissibility.  Arcane differences between California and federal standards for review of agency action, if any (*see* Dfts. Mem. 30), do not undermine the persuasiveness of the California court's treatment of almost identical factual and legal disputes.

1   different view of the evidence concerning viability of the coho in the area, but upon two erroneous

2   views of law and policy:  the legal position that once coho are present, whether or not introduced in

3   a hostile area, they must be listed as a matter of law, and the newly-minted litigation "policy"

4   position (contrary to the ESU Policy) that "genetic similarity" forbids any finer subdivisions

5   amongst existing coho ESUs.

6          *Cactus Corner, Lands Council* and other deferential standard of review cases cited by

7   defendants address *final* determinations of scientific issues, not legal errors.[2]  They do not address

8   threshold review of petitions under § 1533(b)(1)(A), where the consideration is to assess whether a

9   threshold quantum of evidence has been presented to institute a public process to resolve

10  "conflicting views".   Defendants were supposed to determine whether the amount of information

11  presented in the Petition "would lead a *reasonable person* to believe that the measure proposed in

12  the Petition may be warranted".  50 C.F.R. § 424.14(b)(1) (emphasis added).  That standard is

13  manifestly not the ultimate scientific and policy determination, and, indeed, is not the sort of

14  determination as to which defendants have any particular expertise.  Defendants' repeated and

15  erroneous insistence on "definitive" or even "unquestionable" "scientific proof" of the Petition's

16  contentions (*e.g.*, AR1843), contrary to the lawful standard the agency was supposed to employ in

17  reviewing the Petition, is not an insistence to which this Court owes any deference.

18  **II.     THE PETITION MADE A VERY SUBSTANTIAL CASE THAT COHO HAVE**
          **NEVER ESTABLISHED NATURALLY SELF-SUSTAINING POPULATIONS**
19        **SOUTH OF SAN FRANCISCO, AND NEVER WILL.**

20          Over and over again, in discussing the multiple lines of evidence presented by plaintiff,

21  NMFS reviewed the evidence and rejected it on the basis of specific findings that the proof was not

22  "definitive scientific proof" or proof that "unquestionably absent" (AR1843; *see also* AR1845), an

23  approach utterly inconsistent with a legal standard that is not "overly-burdensome" and "does not

24

25

26  _____
    [2] *Cactus Corner* concerned rules for importing fruit potentially infested with medflies, and an
27  arcane challenge to predicted larvae per fruit.  *Id.* at 435.  *Lands Council* concerned whether a
    particular timber sale was consistent with the National Forest Management Act.

28
    PAGE 6:     PLAINTIFF'S COMBINED OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY
              JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
              Case No. 08-CV-1592-RMW

1   require conclusive evidence". *Moden*, 281 F. Supp.2d at 1204.   This was a simple abuse of their

2   discretion to consider and weigh properly the best available scientific information.

3          Defendants now re-characterize their own findings, saying that NMFS "merely expressed

4   disagreement with plaintiff's conclusive assertions".  (Dfts. Br. 27.)  While it is true that the Petition

5   made strong claims about the data, defendants cannot re-frame NMFS' specific findings on

6   evidence as mere comment upon the Petitioner's diction.  It is axiomatic that this Court "may not

7   accept . . . counsel's post hoc rationalizations for agency action", *Northwest Environmental Defense*

8   *Center,* 477 F.3d at 688 (quoting *Burlington Truck Lines*, 371 U.S. at 168).   The ultimate question

9   posed by the statute and regulation is whether the evidence presented in the Petition (and

10  subsequent submissions) "would lead a reasonable person to believe that the measure proposed in

11  the Petition *may be* warranted".  50 C.F.R. § 424.14(b)(1) (emphasis added), not whether the

12  Petition presents conclusive and definitive proof that action is required.

13         As detailed below, plaintiff easily met the appropriate legal standard, and NMFS'

14  evidentiary findings demonstrate that defendants failed to employ this standard in reviewing the

15  evidence, a failing that cannot be overcome by merely inserting the rote conclusion that the Petition

16  "fails to present substantial scientific and commercial information indicating that the petitioned

17  action may be warranted".  (*Cf.* Dfts. Mem. 27.)  "Read as a whole", the standard advocated by

18  defendants (*see id.* (citing *Home Bldrs. Ass'n v. USFWS*, 529 F. Supp.2d 1110 (N.D. Cal. 2007)),

19  the Federal Register Notice demonstrates that defendants imposed an erroneously high standard of

20  proof upon the Petition.

21         **A.    The Lack Of Archaeological Evidence Indicates That The Petitioned Action**
               ***May Be Warranted.***
22

23         Discussing the absence of any coho bones south of San Francisco, defendants assert that

24  such absence "did not provide substantial evidence that coho are not native south of San Francisco

25  Bay". (Dfts. Mem. 23.)  Whether or not the absence of bones itself proves the thesis of the Petition,

26  it surely demonstrates that further consideration of the contrary hypothesis (coho native to the area)

27  may be warranted.  (*See also* AR1125 ("The lack of salmon at any of our sites is consistent with

28

PAGE 7:   PLAINTIFF'S COMBINED OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY
          JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
          Case No. 08-CV-1592-RMW

1    their absence from Central Coast drainages and contrasts markedly with the reported importance of

2    salmon to Native Americans on the northern California coast").)  Moreover, defendants' specific

3    objections to the evidence are meritless.

4              There is no dispute that salmonid bones may not preserve as well as other bones, but the fact

5    remains that "steelhead [a salmonid species] were documented at numerous prehistoric, coastal

6    archaeological sites within their known range from San Francisco to San Diego, and their native

7    status in these streams is unquestioned" (AR1548), while coho were absent.  As to the proposition

8    that because "at least 7,506 elements would have to be recovered before a single bone would be

9    expected" (Dfts. Br. 23 (citing AR1545)), more than 117,000 fish bones have been collected and

10   analyzed from San Francisco down to San Diego (AR1548).  Defendants complain that "the vast

11   majority" of these samples were from sites "well outside the range of coho salmon" (Dfts. Mem. 23

12   n.13), but what we know about that range comes from the evidence, and there is nothing wrong with

13   construing the available evidence to suggest that coho are not native where their bones are not

14   found.  Gathering more data would lead to more definitive conclusions, but in a context where

15   defendants are enjoined to use the best *available* scientific information in decisionmaking, they may

16   not arbitrarily discount the data they do have.

17   **B.     NMFS Ignores Effects On Listed Native Steelhead, Which *May Warrant* Full
            Consideration Of The Petition.**

18

19             Through the Petition, plaintiff is attempting to avoid threats to local steelhead, which he has

20   personally worked diligently to recover for many years.  (*See* AR1358.)  He seeks to avoid ESA-

21   driven "recovery" of a species that was, by all historical accounts, never present in areas south of

22   San Francisco, and whose importation and propagation threatens genuinely native steelhead stocks.

23             *Defendants do not dispute the threat.*  Rather, they claim it is entirely irrelevant to rejection

24   of the Petition because "coho is not an alien species".  (Dfts. Mem. 14 n.7.)  That is disputed.  And

25   as we demonstrated below, under defendants' ESU Policy, coho south of San Francisco are properly

26   denied listed status, alien or not, and whether they are an "introduced species" or not, solely on the

27   basis of their utter insignificance to the evolutionary trajectory of the species.

28

PAGE 8:    PLAINTIFF'S COMBINED OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY
           JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
           Case No. 08-CV-1592-RMW

1    In any event, once this Court advises defendants that they have at least the discretion to draw

2    different ESU boundaries (rather than insisting that "every population of coho needs to be included

3    in some coho salmon ESU" (AR1846)), injury to other listed species is surely a relevant policy

4    factor to consider in assessing whether the "sparingly-to-be-used" authority to list—or not—is to be

5    exercised.  Where defendants have discretion not to list, failure to consider effects on steelhead

6    overlooks "an important aspect of the problem", *Motor Vehicle Mfgs.*, 463 U.S. at 43, and is itself

7    grounds for mandating acceptance of the Petition, *see Central Coast Forest Ass'n v. California Fish

8    & Game Comm'n*, No. 05CS01617, slip op. at 4 (overturning state petition rejection on this basis,

9    among others).

10    **C.    Unanimous Professional And Popular Opinion Prior To 1906 Indicates That
           The Petitioned Action *May Be Warranted*.**

11

12    There is no dispute that up until a few years after the time when the Baker Lake coho were

13    introduced south of San Francisco, multiple fisheries professionals uniformly described the range of

14    the coho as extending north of San Francisco Bay.  The absence of the coho is why the eggs had to

15    be shipped from Baker Lake.  Defendants counter with the suggestion that "[t]here is no dispute that

16    coho were documented south of San Francisco in 1912".  (Dfts. Mem. 21 (citing AR1362,

17    plaintiff's Petition).)  The original source for that observation was a student of Dr. Jordan's, who

18    wrote in the 1912 bulletin of the U.S. Bureau of Fisheries that coho salmon "*were said to have been

19    observed* in the San Lorenzo River at Santa Cruz," a "predictable result of the Brookdale, 1906 and

20    subsequent hatchery plantings" (AR1365 (emphasis added); *see also* AR1377 (no observations in

21    any other river south of San Francisco)).  Nor is it disputed that local naturalists and journalists

22    regarded the coho as a "new species" when introduced.

23    Against all this, defendants claim that the unanimous early scientific and popular accounts

24    "were not reliable evidence" and were "contradicted by the best available evidence" (Dfts.

25    Mem. 22.)  Careful review of the record demonstrates that this conclusion is arbitrary and

26    capricious, and is in any event not consistent with the standard of review NMFS was supposed to

27    employ with respect to the Petition.

28

PAGE 9:    PLAINTIFF'S COMBINED OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY
           JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
           Case No. 08-CV-1592-RMW

With respect to the claim that certain 1895 specimens are the "best available evidence," there is really no dispute concerning the peculiar provenance of the specimens:

- The original logs identify the specimens as other salmon species;

- The tags identifying the specimens were not initially attached to the fish;

- The specimens suffered through the 1906 earthquake (prompting a change in procedure, to attach tags to fish), which broke over 1,000 sample bottles;

- The *Stanford Ichthyological Bulletin* reported that despite efforts to match fish, bottles and tags, "some doubt could not be avoided" as to the provenance of some specimens;

- "A careless curatorial assistant" removed labels from half the jars that would have told if the jars had been broken or not;

- The specimens were initially logged as non-coho after the collection was transferred from Stanford to the California Academy of Science;

- An unknown individual later re-identified the fish as coho under unknown circumstances at an unknown time;

- There are now fish with labels identifying them as the fish collected south of San Francisco in 1895, and they do appear to be coho, although DNA testing cannot confirm the species identification owing to decomposition of the specimens.

NMFS may certainly place some weight on the specimens, notwithstanding these profound difficulties. Perhaps NMFS can even place weight upon the sheer speculation of the Senior Collections Manager as to how the specimens came to be identified as coho, notwithstanding his patent lack of personal knowledge. But for NMFS to characterize the unanimous popular and scholarly opinion as "not reliable evidence", which might be discounted *entirely* as insubstantial in evaluating the Petition, is not consistent with the standard NMFS was bound to employ: whether the amount of information presented in the Petition "would lead a *reasonable person* to believe that the measure proposed in the petition may be warranted". 50 C.F.R. § 424.14(b)(1) (emphasis added). A reasonable person would believe that the unanimous opinion of the both professional and

1    lay observers at the time creates at least a serious question as to the historical presence of the coho

2    south of San Francisco.

3         Moreover, as explained in greater detail below, the mere ephemeral presence of a species

4    does not establish naturally self-sustaining populations, and ephemeral populations do not meet the

5    standards for listing under NMFS' ESU Policy.  Here, the record reflects unusually favorable

6    conditions for salmon in the years immediately prior to 1895, which may have given rise to a

7    temporary occupation by the coho; it is also possible that the samples were the product of earlier,

8    undocumented hatchery efforts.  (*See generally* AR1394-95; AR1460.)

9         **D.    The Physical Differences South Of San Francisco Indicate That The Petitioned
               Action *May Be Warranted.***

10

11        Against the numerous habitat-specific observations of local biologists, and the specific

12   habitat features (like sandbars that prevent coho from entering or leaving the rivers), NMFS refers

13   to a Science Center analysis using various "indicators of geology, hydrology, precipitation, and

14   climate (ambient air temperature)" to conclude that the habitat was actually favorable.  (Dfts.

15   Mem. 24.)  *Defendants do not dispute that what they are proffering is a computer model whose*

16   *"indicators" do not even include the specific factors highlighted by plaintiff:  the prevalence of*

17   *droughts leaving sandbars blocking coho passage and causing other problems, and extreme*

18   *precipitation events that scour out coho eggs.*  (*See* AR1824.)

19        In this case, NMFS can at least purport to be striking a quasi-scientific balance of evidence,

20   but it is incumbent upon the agency to "provide a full analytic defense when its model is

21   challenged", *American Iron and Steel Institute v. EPA*, 115 F.3d 979, 1004 (D.C. Cir. 1997),

22   particularly where, as here, plaintiff has discharged his duty to "identify clearly major variables the

23   omission of which renders the analysis suspect", *Appalachian Power Co. v. EPA*, 135 F.3d 791, 805

24   (D.C. Cir. 1998).

25        Defendants respond with the incantation that courts are to "defer to the evaluations of

26   agencies when the evidence presents conflicting views" (Dfts. Mem. 24), but this is not a case

27   where the *evidence* presents conflicting views.  Rather, the *evidence* is that sand bars and scouring

28

PAGE 11:    PLAINTIFF'S COMBINED OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY
            JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
            Case No. 08-CV-1592-RMW

1  exterminate coho south of San Francisco, while computer models without sand bars or scouring

2  predict favorable conditions.  By leaving out the variables that mattered in its assessment of habitat,

3  NMFS "entirely failed to consider an important aspect of the problem".  *Lands Council*, 537 F.3d

4  at 987 (citation omitted).  And, of course, the question in this case is not which of conflicting views

5  prevails, but whether the conflict is substantial enough to merit a full review of the issues raised by

6  the Petition.

7          Finally, in declaring that plaintiff was required to establish local habitat differences were

8  "significant enough *to preclude coho salmon presence* south of San Francisco" (AR1845; emphasis

9  added), defendants once again applied the wrong standard to a red herring.  Plaintiff has never

10  contended that magic rays immediately exterminate coho that may wander into the area; rather,

11  plaintiff contends that conditions are sufficiently hostile to preclude the persistence of any

12  evolutionarily-significant populations.  Such lack of persistence supports acceptance of the Petition,

13  to evaluate more fully whether listing protections should be extended to these populations.

14          **E.      The Repeated Hatchery Failures Indicate That The Petitioned Action *May Be***
           ***Warranted*.**

15

16          The 100 years of hatchery failures strongly corroborate every other line of evidence in

17  demonstrating that the area south of San Francisco is just not suitable for coho.  *Defendants even*

18  *admitted in their 1995 status review that such failures "suggest that natural populations there are*

19  *not self sustaining"*.  (AR1264;[3] *see also* 70 Fed. Reg. at 37,187 (admission that Scott Creek

20  Hatchery responsible for sustaining coho in that south of San Francisco stream).)

21          In addressing the significance of the 100 years of hatchery failures, defendants grossly

22  mischaracterize plaintiff's position as seeking to deny protection to the coho south of San Francisco

23  "on the grounds that coho inhabiting those streams are not native, but rather are the descendants of

24  exotic hatchery fish introduced there in 1906".  (Dfts. Mem. 10.)  Those 1906 plantings obviously

25  _____

26  [3] Remarkably, this statement pertains to all populations in the CCC ESU group—populations south
   of Punta Gorda.  It is conceivable that upon reconsidering the status of the coho ESU, defendants

27  might reasonably determine not to list any of the CCC ESU fish.  Plaintiff's Petition merely focused
   on the clearest case of populations south of San Francisco.

28

PAGE 12:    PLAINTIFF'S COMBINED OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY
            JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
            Case No. 08-CV-1592-RMW

1    failed just like every planting since then, with millions of "exotic hatchery fish" being introduced

2    over a century and making it impossible to identify the remaining fish as "descendants" of any

3    particular planting (a task whose difficulty is compounded by occasional stray fish).  The important

4    point is not whether we can detect Baker Lake parentage in existing fish; it is that the fish cannot

5    possibly survive in the area without constant hatchery supplementation, and can never establish

6    naturally self-sustaining populations given the unsuitability of the habitat.

7              Rather than address a century of failures, defendants argue that the 1906 introductions failed

8    because fry were planted, and because the plantings were in amounts defendants deem unlikely to

9    have contributed to the subsequent sightings of adults.  (Dfts. Mem. 21.)  That ignores

10   contemporaneous accounts that many adults returned (AR1365) and of general hatchery success

11   (AR441).  More importantly, ever since 1906, every attempt to establish naturally-spawning runs of

12   coho has run afoul of the same cycle of droughts, floods, sandbars and other factors that will doom

13   any future attempts to "recover" coho in the vicinity—over the course of many years of

14   improvements in hatchery practices.  Mere invocation of a habitat computer model, on this record,

15   constitutes a failure to "examine the relevant data and articulate a satisfactory explanation

16   . . . including a 'rational connection between the facts found and the choice made'".  *Northwest*

17   *Environmental Defense Center v. BPA*, 477 F.3d 668, 687 (9th Cir. 2007) (quoting *Motor Vehicle*

18   *Mfgs*., 463 U.S. at 43).

19             Defendants also do not dispute that protecting hatchery fish or introduced populations is not

20   even an object of the ESA.  Defendants' rejection of the Petition was thus also arbitrary and

21   capricious because NMFS "entirely failed to consider an important aspect of the [listing] problem",

22   *Motor Vehicle Ass'n v. State Farm Mutual Auto Ins. Co.*, 463 U.S. 29, 43 (1983):  the policy

23   wisdom of listing fish that can only be maintained through constant hatchery supplementations.

24   **III.    THE PETITION DEMONSTRATED DEFENDANTS' FAILURE TO EXERCISE
         LISTING AUTHORITY CONSISTENT WITH THEIR OWN ESU POLICY.**

25             It is axiomatic that NMFS is bound to apply its own policies in its own decisionmaking.

26   Here, the ESU Policy required NMFS to define ESUs based upon the two overriding factors in the

27   Policy.  Specifically, a group of fish is to be deemed an ESU when it is (1) "substantially

28

1 reproductively isolated" from other members of the species and (2) it is an "important component in

2 the evolutionary legacy of the species".  56 Fed. Reg. at 58,618.  That policy was reiterated through

3 a Joint NMFS/U.S. Fish & Wildlife Service "Policy Regarding the Recognition of Distinct

4 Vertebrate Population Segments under the Endangered Species Act" (hereafter, Joint Services

5 Policy), which re-characterized the two Policy factors as "discreteness" and "significance".  61 Fed.

6 Reg. 4,722, 4,725 (Feb. 7, 1996); *see also id.* at 4,722 ("The NMFS Policy is a detailed extension of

7 this joint policy").

8        Defendants refer to this second criterion as "the evolutionary legacy of a species" (Dfts.

9 Mem. 4), completely omitting the concept of *importance* or *significance*.  As the *Maine* court

10 explained:

11        "Significance recognizes that 'populations commonly differ in their importance to
         the overall welfare of the species they represent.' 61 Fed. Reg. at 4,723 . . . For
12        this reason, the significance inquiry serves to implement Congress' intent that
         DPS authority be used 'sparingly'.  *See id.*  Significance also concentrates
13        conservation efforts on 'avoiding important losses of genetic diversity.' *Id.* at
         4724, col. 3 . . . A population may be significant if (1) the discrete population has
14        persisted in an ecological setting unusual or unique for the taxon, (2) there exists
         evidence that loss of [the] discrete population segment would result in a
15        significant gap in the range of the taxon, (3) there exists evidence that the discrete
         population segment represents the only surviving natural occurrence of a taxon
16        that may be more abounded elsewhere as an introduced population outside its
         historic range, or (4) there exists evidence that the discrete population segment
17        differs markedly from other populations of the species in its genetic
         characteristics." *See* 61 Fed. Reg. 4725." *Maine*, 257 F. Supp.2d at 388 (parallel
18        citations omitted).

19 *None* of these factors support the significance or importance of the populations south of San

20 Francisco:  the populations have never "persisted"; no significant "gap" would result from trimming

21 the southernmost boundary of the listings; the fish are not the last coho survivors; and they do not

22 differ "markedly" in genetic characteristics from more northerly fish.

23        Defendants also argue that under their ESU Policy, ephemeral populations like those south

24 of San Francisco "should not be designated as an ESU in their own right, but rather should be

25 included within the context of larger populations".  (Dfts. Mem. 26 n.14 (citing 71 Fed. Reg. at

26 14,687)).  We agree they "should not be designated as an "ESU in their own right", because they do

27 not meet the criterion of importance, or significance.  As to whether they "should be included

28
PAGE 14:   PLAINTIFF'S COMBINED OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY
           JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
           Case No. 08-CV-1592-RMW

1    within the context of larger populations [*sic*—should be 'groups of populations']", the Policy is

2    quite to the contrary.

3           Defendants' citation at page 26 of their memorandum is not to the ESU Policy, but to

4    NMFS' Federal Register Notice rejecting the Petition.  And that Notice in turn refers to the

5    Technical Memorandum ("Waples (1991)"), rather than the Policy.  Tracing this citation to its

6    source, then, the Technical Memorandum, we find the statement that:

7           "In evaluating the appropriate grouping level, a balance must be struck between
            two opposing concerns.  On the one hand, it is important to identify the smallest
8           units that meet the criteria set out in Section II [later the ESU Policy criteria]
            because this allows the greatest flexibility in ensuring the appropriate level of
9           protection for different ESUs within a more comprehensive group.  On the other
            hand . . . the smallest units supporting local populations of salmon may not be
10          evolutionarily independent from other nearby populations.  *A key question is,
            [h]ow can evolutionarily important units be protected without running the risk of*
11          *artificially maintaining units that might naturally undergo episodes of*
            *extinction/recolonization on something short of evolutionary time scales?*
12
            "The following approach is suggested.  Identifiable ESUs should not be combined
13          for the sake of convenience.  In general, however, ESUs should correspond to
            more comprehensive units unless there is clear evidence that evolutionarily
14          important differences exist between smaller population segments.  This approach
            is consistent with the stipulation that NMFS and FWS should use sparingly their
15          authority to list vertebrate populations."  (AR1035; emphasis added.)

16   The whole point of the Petition is to address the key question raised by Dr. Waples:  how to protect

17   evolutionarily important units without "running the risk of artificially maintaining units that might

18   [and here do] naturally undergo episodes of extinction/recolonization[4] on something short of

19   evolutionary time scales".  By accepting the Petition, and trimming the focus of ESA protection to

20   evolutionarily important units to the north, defendants can bring their listing decision into

21   congruence with the ESU Policy and the ESA itself.

22          As Dr. Waples explained elsewhere in the Technical Memorandum, "populations resulting

23   from the introduction of fish into a local area not occupied by the biological species (particularly if

24

25   _____

26   [4] The Petition takes the position that the "recolonization" here is a "recolonization" by hatchery
     introductions.   At most, the 1895 samples suggest some possibility of natural recolonization, but in
27   either case, the fish cannot and do not persist, and are plainly outside the scope of what is to be
     protected under the Policy.

28

     PAGE 15:    PLAINTIFF'S COMBINED OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY
                 JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
                 Case No. 08-CV-1592-RMW

1   the area is outside the historic range of the species) are probably not ESUs . . .".  (AR1035.)   The

2   Petition demonstrates that coho south of San Francisco are just such fish.

3          Defendants may seek refuge in Dr. Waples' "legal" comment in the Technical Memorandum

4   that expanding ESUs to cover hundreds of miles of coast with multiple rivers, as opposed to

5   singling out smaller units, is using listing authority "sparingly".  (*See* AR1035.)  Presumably he

6   meant that fewer listings are required if more fish are put in the group, but the more reasonable

7   interpretation is that Congress intended that few groups of *fish* (not few listings) should meet the

8   stringent standard to qualify as DPSs.  *See also* 61 Fed. Reg. at 4,724 (noting importance of

9   "concentrat[ing] conservation efforts . . . on avoiding important losses of genetic diversity").

10          One of the commentators on the draft ESU Policy made almost this very point, stating that

11   Dr. Waples' interpretation was "an inappropriate reversal in the burden of proof from the intent of

12   Congress".  56 Fed. Reg. at 58,617.  *Perhaps in agreement, NMFS did not put any injunction to list*

13   *the largest possible units in the ESU Policy itself.*

14          Rather, in the Policy, NMFS specifically addressed and re-framed Dr. Waples' comment in

15   the Technical Memorandum by saying:  ". . . it reflects (1) the view that population 'distinctiveness'

16   should be supported by positive scientific evidence, and (2) concern that fragmenting groups into

17   multiple ESUs on the basis of insufficient data may create artificial units without a biological

18   basis".  (*Id.*)   The Joint Service Policy also contains no presumption in favor of larger groups, and

19   even warns against "efforts directed at either [1] well-defined but insignificant groups or [2] entities

20   believed to be significant but around which boundaries cannot be recognized".  61 Fed. Reg. at

21   4,724.[5]

22          Not only does the ESU Policy contain no presumption in favor of larger groups, it assumes

23   that fish populations will be evaluated for ESU status on a population-by-population basis.  *See* 56

24   Fed. Reg. at 58,618 (repeatedly addressing "the population", and referring to comparison with

25   _____

26   [5] The obvious implication of the Joint Service Policy as it addresses the second class of "entities
    believed to be significant" is that where, as here, there is a smooth continuum of genetic
    relationships, defendants should seriously consider refraining from listing any group smaller than a

27   species.  The Petition, of course, does not go so far.

28

PAGE 16:   PLAINTIFF'S COMBINED OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY
           JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
           Case No. 08-CV-1592-RMW

"other populations").[6]  A population-level approach is reiterated in the Joint Services Policy, which

requires defendants to consider the significance of "*populations*" to the overall welfare of the

species they represent.  61 Fed. Reg. at 4,723.[7]

Notwithstanding both the ESU Policy and the Joint Services Policy, in rejecting the Petition

defendants returned to Dr. Waples' erroneous position:

> "Waples (1991) argued that ephemeral populations should not be considered
> ESUs by themselves but should be included within the context of larger
> populations that will persist over evolutionary time frames.  Using this rationale,
> every population of coho needs to be included in some coho salmon ESU."
> (AR1846.)

Notwithstanding defendants' present litigation position, this is really the ultimate rationale for

rejecting the Petition:  *everything must be listed.*  No clearer error of law could be imagined, as

Congress never intended to have defendants conduct a long march through the animal kingdom,

slowly but surely adding everything to a listed ESU irrespective of significance.  Rather, defendants

are to exercise their discretion to list *or not list* in congruence with the law and the controlling

policies.

The only "finding" relating to importance or significance is the assertion in the Federal

Register Notice that:

> "protection and restoration [*sic*] of the coho salmon populations south of San
> Francisco Bay are essential to the conservation of this ESU as a whole because
> this geographic area is at the southernmost edge of the species distribution in
> North America and is likely to be a source of evolutionary innovation for the
> species".  (AR1846.)

---

[6] At some points, the word "stock" is used, but not defined.  The concept of "groups of populations"
is discussed very briefly in the response to comments on the proposed ESU Policy, and regrettably
NMFS appears to have ignored concern that the issue was "very important and should be addressed
more thoroughly".  56 Fed. Reg. at 58,617.  This Court's order to require NMFS to accept the
Petition and reconsider the ESU question would provide a useful opportunity to do so.

[7] At one point, the Joint Services Policy notes that "a population may be circumscribed by a set of
experimental conditions, or it may approximate an ideal natural group of organisms with
approximately equal breeding opportunities among its members, or it may refer to a loosely
bounded, regionally distributed collection of organisms".  61 Fed. Reg. at 4,722.  The latter, broader
use of the term population should, however, be limited under the statutory requirement that the
listed distinct population segment "interbreeds when mature".  16 U.S.C. § 1532(16).  Since the
distinguishing characteristic of salmon is that they return to their natal river when mature and
interbreed with others *from that river*, NMFS plainly ought to have authority to list fish in a single
river as an ESU as "reproductively isolated/distinct" if they are of significance.

1    Yet defendants admit that they cannot even tell whether or not, as plaintiff claims, the populations

2    south of San Francisco are "sink populations":  "one that produces fewer recruits than spawners and

3    receive more immigrants than the migrants it produces".  (AR1846.)   Defendants insist that since

4    even sink populations are not a "black hole", some coho might emerge from the area and contribute

5    genetic material north of San Francisco (*see id.*), and ask the Court to defer to their "prediction" of

6    this possibility, coupled with the possibility that such a fish might contain an unspecified

7    "evolutionary innovation," as being within the special expertise of defendants "at the frontiers of

8    science".  (Dfts. Mem. 26 (quoting *Lands Council*, 537 F.3d at 993).)

9         There is not a shred of evidence in the record to support this "prediction", nor can it be

10    dignified with the term "science".  It is unclear what sort of "evolutionary innovation" defendants

11    imagine.  The notion that some sort of supercoho might someday evolve that can leap over sandbars

12    and whose eggs magically hatch with thriving juveniles notwithstanding their inevitable scouring to

13    the sea (or into the stomachs of predators) is best characterized as science fiction or science fantasy

14    and not the sort of scientific prediction to which this Court owes any deference.  As to whether this

15    is "science," the United States Supreme Court has explained:

16         "Ordinarily, a key question to be answered in determining whether a theory or
         technique is scientific knowledge that will assist the trier of fact will be whether it
17         can be (and has been) tested. "Scientific methodology today is based on
         generating hypotheses and testing them to see if they can be falsified; indeed, this
18         methodology is what distinguishes science from other fields of human behavior."
         Green 645. *See also* C. Hemple, Philosophy of Natural Science 49 (1966) ("[T]he
19         statements constituting a scientific explanation must be capable of empirical
         test"); K. Popper, Conjectures and Refutations: The Growth of Scientific
20         Knowledge 37 (5th ed. 1989) ("[T]he criterion of the scientific status of a theory
         is its falsifiability, or refutability, or testability") (emphasis deleted)."

21

22    *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 593 (1993); *see also id.* at 589-90

23    ("in order to qualify as 'scientific knowledge,' an inference or assertion must be derived by the

24    scientific method").  One will search the Administrative Record in vain (and indeed one will search

25

26

27

28

1  the libraries of science in vain) for any empirical tests (or even measurements[8]) concerning the

2  significance of "evolutionary innovation" in an area that cannot support self-sustaining populations.

3      Nor does speculation about potential "evolutionary innovation" even constitute a relevant

4  finding under the ESU Policy.  The factor that is relevant is whether the population or populations

5  of interest form an "important component in the evolutionary legacy of the species".  A *legacy*

6  refers to that which has actually existed, not to that which might someday exist.

7      Defendants admit that "the test is whether or not the extinction of the population would

8  represent a 'significant loss to the ecological/genetic diversity of the species'" (Dfts. Mem. 5

9  (quoting ESU Policy)).  If the loss of a handful of tiny hatchery-supported populations that cannot

10  possibly survive on their own is to be deemed "significant" to the coho species as a whole, the

11  entire ESU concept is meaningless.  Speculation concerning possible "evolutionary innovation" is a

12  pseudoscientific cloak for agency's actual position:  any loss anywhere is "significant" and "every

13  population of coho salmon needs to be included in some coho salmon ESU" (AR1846).

14  **IV.  DEFENDANTS MAY NOT INVOKE GENETICS DATA TO EXCUSE
        NONCOMPLIANCE WITH THE ESU POLICY.**

15

16      Defendants do not really seriously dispute that analyzed on their own, the south of San

17  Francisco fish would not meet the ESU criteria, for they are plainly not "an important component in

18  the evolutionary legacy of the species", 56 Fed. Reg. at 58,618.  Rather, defendants attempt to

19  sidestep the issue with sophistry and a cloud of arcane genetic science.  As to the sophistry,

20  defendants complain that plaintiff did not specifically "challenge[] NMFS' determination that the

21  Central California ESU *as a whole* is of evolutionary significance to the species" (Dfts. Mem. 25;

22  emphasis in original).  This misses the point.  Plaintiff is not asking NMFS to chop off part of a

23  concededly-accurate ESU; rather, plaintiff contends that NMFS must re-apply its policies in light of

24  _____

25  [8] Defendants' position brings to mind Lord Kelvin's remark:

        "When you can measure what you are speaking about, and express it in numbers, you know
        something about it; but when you cannot measure it, when you cannot express it in numbers,
        your knowledge is of a meager and unsatisfactory kind: it may be the beginning of
        knowledge, but you have scarcely, in your thoughts, advanced to the stage of science."
        William Thomson, Lord Kelvin, Popular Lectures and Addresses [1891-1894].

28

PAGE 19:   PLAINTIFF'S COMBINED OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY
           JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
           Case No. 08-CV-1592-RMW

the data in the Petition and the Administrative Record to make legally-permissible groupings of fish for listing.  The evolutionary significance of the CCC coho as a group does not matter if the group has been mis-specified at the outset of the listing process.  In accepting the Petition, and providing fuller consideration to the issues raised by it, NMFS may or may not determine to retain some or all of the CCC ESU as one or more listed "species"; all plaintiff is seeking at this point is a ruling that defendants cannot defeat the Petition by claiming that the current CCC ESU boundaries are set in stone.

Defendants, like the proverbial squid, emit a cloud of arcane genetic evidence to hide their simplistic "list everything" rule in claiming that ". . . because naturally spawning coho populations south of San Francisco are not genetically distinct from the Central California ESU, NMFS cannot simply exclude them from the Central California ESU listing as Plaintiff's petition requested." (Dfts. Mem. 16.)  At the outset, the notion that genetics data "alone" supports rejection of the Petition (*see* Dfts. Mem. 15), trumping all other issues in species definition, was not the rationale expressed in rejecting the Petition (*cf.* AR1845-46).   As such, it is a *post hoc* rationalization for agency action which this Court is bound to reject.  *See Northwest Environmental Defense Center v. BPA*, 477 F.3d 668, 688 (9th Cir. 2007) (Court "may not accept . . . counsel's post hoc rationalizations for agency action"; quoting *Burlington Truck Lines v. United States*, 371 U.S. at 156, 168 (1962)).

More importantly, reliance on genetics data to trump other considerations is utterly contrary to the ESU Policy, and defendants in any event grossly misconstrue the data:  the coho south of San Francisco are genetically distinct from fish north of San Francisco—at least to the extent that any group of coho can be regarded as distinct from any other group when they all share exactly the same genes.

### A.     Genetics Evidence Can Play No Controlling Role In ESU Definition.

The notion that genetic similarity is to be given controlling significance in setting the boundaries of ESUs is utterly refuted by the Policy itself, the Technical Memorandum supporting it, and the judicial decisions that have construed these documents.  Indeed, "the majority of 'species'

1    determinations under the ESA have been made *without the aid of any direct genetic evidence*".  56

2    Fed. Reg. at 58,616 (emphasis added).

3           The ESU Policy emphasizes over and over that genetics evidence is not to be given

4    controlling importance in assessing either of the two ESU factors.  As the Policy explains, "since

5    genetic structure is highly sensitive to very low levels of effective dispersal, genetic analyses are of

6    limited use in determining whether two groups are exchanging demographically relevant numbers

7    of individuals".  (AR1627 (citation omitted)); *see also* 56 Fed. Reg. at 58,614 (ESU Policy cautions

8    against excessive reliance on genetic data in "inferring reproductive isolation"); *id.* at 58,615

9    (warning that evidence of importance based on adaptive differences "must come from sources other

10   than protein electrophoresis"); *id.* at 58,618 (noting several sources of data that must all be

11   considered in connection with reproductive isolation).)  The Joint Service Policy also specifically

12   rejected the notion "that genetic distinctness be demonstrated before a DPS could be recognized".

13   61 Fed. Reg. at 4,723.

14          Indeed, in prior litigation concerning the ESU Policy and Joint Services Policy, the *Maine*

15   court noted that the "Services make it clear that discreteness, although serving the purpose of

16   genetic diversity, *is not established by genetic data*".  *Maine*, 257 F. Supp.2d at 387 n.16 (emphasis

17   added).   The 168-page steelhead opinion issued earlier this week in the Eastern District reviewed

18   the ESU Policy and scientific evidence at length to reach the same conclusion.  The Court observed

19   that "[g]enetic relatedness is not a direct determinant of shared adaptive diversity or ecological

20   exchangeability among populations . . .  Therefore evidence of phylogenetic relatedness should not

21   be considered a sufficient condition for supposing that two groups are ecologically or

22   physiologically exchangeable or equivalent".  *California State Grange*, slip op. at 143 (quoting

23   expert panel).  This should not be surprising, as "existing 'genetic profiling technology examines

24   only a limited portion of the genome, and there is ample evidence of important genetic differences

25   between stocks that we cannot identify with current technology'", and "genetic divergence 'may not

26

27

28

1  be detectable with randomly selected or neutral molecular genetic markers[9],' which are the kind

2  typically used in genetic profiling".  *Id.*

3         In elevating genetic similarity as the determining factor for ESU definition, defendants are

4  violating their own Policy, which expressly rejects "an unreasonably rigid test for distinctness".  61

5  Fed. Reg. at 4,724, much less one based exclusively upon genetics.  Their position should not be

6  dignified as a "test" or standard because nowhere in the record is any criterion for a "genetic

7  distinctness" "test" articulated.  Nor could such a "test" even be devised, in light of the National

8  Research Council's admonition that "science alone does not lead to a conclusion that any

9  objectively definable degree of distinctiveness is more significant than another".  NRC, *Science and*

10  *the Endangered Species Act* 44 (Nat'l Academy Press 1995).[10]  By all appearances, defendants have

11

12  [9] These are precisely the type of markers used in the coho genetic analyses relied upon by
    defendants.  (*See* AR1627.)

13  [10] Defendants argue that citation of the NRC report does not "fit within any judicially recognized
    exception for extra-record materials".  (Dfts. Mem. 29.)  Defendants are wrong.

14

15         "The reviewing court may go outside the record to consider evidence relevant to the
           substantive merits of an agency decision: 1) to determine whether the agency considered all
           relevant factors; 2) to determine whether the agency's 'course of inquiry was sufficient or

16         inadequate'; 3) when it is necessary to explain the agency's action; 4) when the agency has
           relied on evidence outside the record; 5) to explain technical terms or complex subject

17         matter; or 6) when there is a showing of agency bad faith . . ."

18  *Hells Canyon Preservation Council v. Jacoby*, 9 F. Supp.2d 1216, 1223 (D. Or. 1998) (citations
    omitted; quoting *Alpine Lakes Protection Society v. U.S. Forest Service,* 838 F.Supp. 478, 481

19  (W.D.Wash.1993)); *see also Southwest Center for Biological Diversity v. U.S. Forest Service*, 100
    F.3d 1443, 1450 (9th Cir. 1996).  Exceptions (1), (2), (3) & (5) are pertinent.  The NRC report

20  provides valuable background information putting the particular scientific disputes raised by this
    motion into the larger context of utilizing science to craft species definitions, explains the task

21  properly before the agency, and confirms that a single-minded focus on the opinions of geneticists
    constitutes a failure to consider relevant factors and an inadequate "course of inquiry".

22
      Defendants also argue that the NRC report refers to evolutionary units, rather than ESUs, an

23  approach which "places less stress upon reproductive isolation and recognizes that significance
    exists along a continuum".  (Dfts. Mem. 30 (quoting *Maine v. Norton*, 257 F. Supp.2d at 383).)  As

24  the *Maine* court noted, the NRC observed that "application of either the EU or the ESU concept
    would lead to similar results most of the time, especially for vertebrates" (*id.* (quoting NRC)), and

25  the NRC's comments about the lack of sharp divisions in either distinctness or significance   stand
    independent of the verbiage used for species definition, as the ESU Policy itself recognizes, *see* 56

26  Fed. Reg. at 58,617 ("often, . . . there will be more than one hierarchical level" (rivers, tributaries,
    streams, creeks, etc.) which may be considered reproductively isolated).  To the extent that

27  defendants are insisting that significance does not "exist along a continuum", they appear to be
    reiterating their "everything is significant and everything must be listed" approach to administration

28  of the ESA, which is contrary to law.
    PAGE 22:   PLAINTIFF'S COMBINED OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY
               JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
               Case No. 08-CV-1592-RMW

simply put forward a litigation position of placing an improper and controlling significance on genetic data to avoid accepting and seriously considering the issues raised by the Petition—*quite apart from the problem that the genetic data itself does not even support their position.*

### B.    The Available Genetics Data Cannot Rationally Be Used To Draw Any Particular ESU Boundary

The centerpiece of the "genetics" defense is a study of "genetic variation for 18 microsatellite genes in coho salmon populations" (Dfts. Br. 15).  According to the findings of defendants in rejecting the Petition, these 18 microsatellite genes have almost 500 variable forms (alleles), and their frequencies are supposed to permit "sufficient information content to detect isolation between populations and insight into biogeographic patterns at multiple scales".  (*Id.* (quoting 71 Fed. Reg. at 14686).)  However, as demonstrated below, such data cannot infer anything about historical presence, or offer any bright-line boundaries for species definition.  The geographical scope of an ESU is fundamentally a policy decision, and all plaintiff seeks is a ruling instructing defendants that they *do* have the authority to draw the ESU line differently, and merely ordering them to *consider* doing so.

### 1.    Genetics data cannot infer historical presence.

Defendants persist in defending the assertion in the Federal Register Notice that genetics data somehow demonstrate that the coho south of San Francisco "represent a historic part of the CCC [central California coast] coho salmon ESU".  (Dfts. Mem. 15.)  Yet they frankly admit on the next page of their memorandum that "[t]here is no dispute that, because no usable pre-1906 genetic samples are known to exist . . . genetic analysis of present day coho populations in the area cannot directly tell scientists whether those coho are, or are not, descended from pre-1906 populations [allegedly] inhabiting this area".  (*Id.* at 16.)  Thus their position has shifted (again an impermissible *post hoc* rationalization) to the idea that genetics data can tell whether the present coho "are descended from exotic out of state transplants".  (*Id.*)

As noted above, this entirely misses the point.  Plaintiff does not contend that the 1906 plantings succeeded in producing continuing runs of Baker Lake-genetic fish south of San Francisco.  Quite to the contrary, plaintiff contends that the 1906 plantings worked for a few years

1    until the harsh conditions wiped the fish out, as with all other attempts to foster the fish in this area.

2    Plaintiff has at all relevant times acknowledged that the 1906 plantings and all of the other hatchery

3    experiments of the last 100 years, with genetic material from all over the West Coast, *failed to*

4    *establish any persistent populations of coho south of San Francisco*.  The fundamental point of the

5    Petition is that the area south of San Francisco is not suitable for coho such that they cannot survive

6    there as a native species; the hatchery failures are but one of many lines of evidence proving this

7    point.

8          In light of the 100 years of history, it should be no surprise that there is "evidence

9    genetically linking coho populations south of San Francisco to other populations in the Central

10   California ESU" (Dfts. Mem. 22)—the parents of many of the hatchery fish released south of San

11   Francisco since 1906 were imported from within and without the ESU.  (*See, e.g.*, AR1319 (post-

12   1980 imports of coho from Oregon, Washington & California).)  More generally, all coho are part

13   of the same species, so of course there is evidence genetically linking them to other coho—*they all*

14   *have the same genes.*  (AR1029.)

15         Plaintiff's opening memorandum (at 16-18) summarized in detail the devolution of

16   defendants' position.   Defendants initially, and correctly, expressed agnosticism as to how one

17   could infer *anything* about historical population structure after 100 years.  Yet in rejecting the

18   Petition they claimed that the genetic data "indicate coho salmon south of San Francisco Bay

19   represent a *historic part* of the [Central California Coastal] CCC coho ESU" (AR1845; emphasis

20   added).  Before this Court, defendants "acknowledge" (Dfts. Mem. 16) but make no attempt to

21   explain their striking change in position, instead over-simplifying the issue to their newly-minted

22   claim that "genetic similarity" foreclosed the exercise of any discretion in the listing process.

23         **2.     Asserted "genetic similarity" between south of San Francisco coho and
             other coho does not compel any particular ESU.**

24

25         The genetics data draws no sharp line requiring the ESU division selected by NMFS.  At

26   best, it is indicative of a general pattern along the West Coast where populations further apart

27

28

1   geographically diverge further genetically.[11]  Here NMFS employed "three general analytical

2   approaches" with the genetics data:  (1) "analyses of pairwise $F_{ST}$"; (2) "phyleogeographic trees"

3   and (3) "assignment tests".  Remarkably, all three of these analytical approaches demonstrate

4   unique genetic features of the populations south of San Francisco, and utterly refute defendants'

5   claim that the south of San Francisco fish must be lumped in with more northerly fish.

6        1.       Pairwise $F_{ST}$ is a measurement to assess levels of gene flow, with low values

7   showing that the fish are more closely related than larger values.  Here the pairwise $F_{ST}$ data shows

8   a general pattern of increasing genetic difference as a function of geographic distance.  The data

9   does not indicate any particular breaks or distinctions among populations, and certainly no

10  distinctions so bright as to *require* a division between prospective ESUs:



**Figure 2.4.** Isolation-by-distance in coho salmon based on pairwise $F_{ST}$ and geographic distance for samples from the CCC-Coho ESU (solid line) and throughout coastal California (dashed line). For samples from different basins, geographic distance is calculated as the sum of the length of the coastal contour (omitting major bays such as the San Francisco Bay) between stream mouths and the upstream distance of each sample location. For samples from within the same basin, geographic distance is calculated as the distance "as-the-fish-swims" within the stream network.

---

[11] This pattern of "isolation-by-distance is based on an assumption of equilibrium between [genetic] dispersal and drift", yet to prove the pattern NMFS simply threw out data that did not fit.  (*See* AR1653 n.9)  More general analyses of coho across the entire Pacific Northwest find a "surprising" lack of variation, which "suggests either that modern coho arose recently from a single ancestral population or that historical coho populations were very small or both".  (AR1347.)  Put another way, *no coho populations are really very genetically distinct at all*, yet another reason that

1    (AR1656.)   Indeed, viewed from a Coast-wide perspective (dashed line), the same variation by

2    distance relationship holds for the California coast as a whole as compared with just the CCC ESU

3    solid line (*i.e.*, the regression lines are the same slope, with the coastwide line being higher owing to

4    more genetic differences over the larger area).

5         If NMFS' decisions to draw geographic boundaries between ESUs (here the CCC and

6    Southern Oregon/Northern California Coastal (SONCC) ESUs) were *forced* by the genetic data, the

7    administrative record would demonstrate some sort of distinction at the ESU boundary (here Punta

8    Gorda).[12]   The geographic distinction that does appear from the $F_{ST}$ data actually supports

9    differentiation of the group south of San Francisco, because NMFS found that "[e]stimates of

10   pairwise $F_{ST}$ . . . are substantially smaller among basins south of the Golden Gate than elsewhere in

11   the CCC-Coho ESU . . .".  (AR1657).  If any subgroup is thus to be deemed "distinct" on the basis

12   of this portion of the genetic analysis, it is the south of San Francisco coho.

13        Ironically, an earlier genetic analysis in the record was undertaken in part "to examine

14   genetic support for the ESU south of San Francisco that is recognized by California's Endangered

15   Species Act".  (AR1341).[13]   It concluded "[g]enetic distance among sites supports [then-]current

16   ESU structure; populations from the Central California [federal] ESU form a reasonable cluster,

17   joined next by Scott Creek . . .".  (AR1346.)  Simply put, genetic analysis identifies groupings

18   among fish, but it remains a matter of administrative discretion as to how to lump the groupings

19   together.  The genetics data can and did support treating the fish south of San Francisco as their own

20

21   _____

     defendants' present emphasis on genetics as the Rosetta Stone for species definition makes no
22   sense.

23   [12] Put another way, the claim that "genetic data indicate that most samples from this region (CCC)
     differ substantially from coho salmon north of Punta Gorda" (60 Fed. Reg. at 38,016) is not
24   supported in the administrative record *to the extent that the differences are imagined to be
     correlated with any particular dividing line.*  One might as well say that genetic data indicated that
     most samples south of San Francisco differ substantially from coho salmon north of San Francisco,
25   or at any other point along the Coast.

26   [13] The State of California initially listed the populations south of San Francisco in 1996 as a
     "species" in their own right entirely independent of more northerly coho.  They were the first group
27   of coho listed, were later combined into a larger group, and the California courts have twice
     overturned the refusal of the California Fish and Game Commission to accept essentially the same
28   petition at issue here seeking redefinition of that larger group.

     PAGE 26:    PLAINTIFF'S COMBINED OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY
                 JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
                 Case No. 08-CV-1592-RMW

1    unit, and can support treating the fish of part of a larger unit too (a larger cluster).  One must look

2    beyond genetics to questions of policy to determine which populations to include in an ESU.

3        2.        Review of the data from another tool for looking at microsatellite frequencies

4    confirms the lack of any single "bright line" in selecting grouping for ESU purposes.

5    Phyleogeographic trees are generated by software routines as a means of forcing "lines" between

6    the raw data samples, hence the form:



**Figure 2.2.** Bootstrap consensus tree for coho salmon in California. Consensus tree is based on trees constructed with a neighbor-joining algorithm (Saitou and Nei, 1987) using Cavalli-Sforza and Edwards (1967) chord distances calculated for 5000 data sets generated by bootstrap resampling from data for 18 microsatellite loci.  Numbers on internal branches indicate the proportion (>50%) of trees in which the indicated node appeared.  Samples are identified by stream, brood year, life stage ("A" indicates adult; "S" indicates smolt or outmigrating juvenile; "Y" indicates young-of-year juvenile), and where appropriate, as being collected from hatchery "[H]" or wild "[W]" populations. Parenthetical information indicates tributary basin (where relevant) or county.

27   (AR1654.)  The CCC/SONCC line NMFS has drawn in the middle of this tree is not *compelled* by

28   the data, and the Population Structure Memo does not explain the choice; it is taken as a given for

1    purposes of the analysis.  The data supports distinguishing the two groups because they are different

2    branches on the tree, *but no genetic principle or rule tells NMFS whether to make the entire tree an*

3    *ESU, to divide it in two pieces (as it did  here with the CCC/SONCC division), to make each branch*

4    *an ESU, or even to draw a bigger tree with more samples from further up the Coast, in which all*

5    *California coho might be a single branch, or even all West Coast coho.*

6           As the ESU Policy confirms, "often, . . . there will be more than one hierarchical level"

7    (rivers, tributaries, streams, creeks, etc.) which may be considered reproductively isolated.  56 Fed.

8    Reg. at 58,617. "Therefore," continues the Policy in the very next sentence, it is important to

9    identify such units "that contribute substantially to the ecological/genetic diversity of the species as

10   a whole".  *Id.*  This, of course, is precisely what defendants refuse to do.

11          In discussing the tree reproduced above, NMFS also admitted that the "[s]amples from

12   watersheds south of the Golden Gate (Scott, Waddell, Gazos, and San Vincente creeks do not fit

13   th[e] pattern" (AR1653).[14]  This comment can only be read to suggest that while partaking of a

14   general "genetic similarity" up and down the West Coast, the south of San Francisco fish are

15   genetically distinct from those further north.  Thus again, at the broad-brush level of mere "genetic

16   similarity," one finds differences with respect to the south of San Francisco fish.

17          3.       Finally, with regard to the third form of analysis employed by defendants,

18   assignment tests, NMFS geneticists claimed no more than that "they indicate a highly structured set

19   of populations"—not any particular ESU dividing line.  (AR1657.)  Their analyses "correctly

20   assigned most (>98%) of fish to their basin of origin", but "[o]f the 72 misassignments between

21   basins, 72% occurred between Waddell, Scott, and San Vincente creeks, all of which are small

22   streams adjacent to one another south of the Golden Gate".  (AR1657.)  In other words, again the

23   south of San Francisco coho display genetic differences from the other CCC coho populations,

24   suggesting that appropriate analysis would put them in their own subgroup for listing evaluation.

25

26   _____

[14] NMFS' bald assertion that this and other discussion refers to "the genetic relationship of coho

27   populations south of San Francisco *to one another*" (Dfts. Mem. 17), rather to their distinctness

     from all of the populations analyzed, is plainly wrong.

28

1    Given all of the genetic *differences* noted in all three lines of analysis between the south of

2    San Francisco coho and the other California coho, it is not surprising that the geneticists did not

3    attempt to rely upon genetics data when hypothesizing the historical population structure for south

4    of San Francisco coho.  (*See* AR1672).  Defendants challenge this statement as "inaccurate",

5    referring the Court to AR1658 (Dfts. Mem. 17-18), but do not address the plain language of the

6    geneticists upon which plaintiff relies.  The geneticists concluded (erroneously) that there were

7    historical populations south of San Francisco,

8       "based almost entirely upon the predictions of the connectivity-viability analysis
        [the defective computer model], as other relevant sources of information (e.g.,
9       genetic data and estimates of migration rate) appear to be confounded by the
        effects of ongoing transfers, and in any case are drawn from what we conclude are
10      historically dependent populations [i.e., dependent upon the constant hatchery
        supplementation]".  (AR1672.)

11

12   Above all else, the opinions of defendants' own genetics experts refute their present effort to make

13   genetics data the centerpiece of their defense.

14    More generally, defendants' repeated invocation of general "genetic similarity" of the south

15   of San Francisco fish to other CCC ESU (and California coastal) fish arbitrarily and capriciously

16   brushes over the results of the three underlying analyses, none of which *require* that south of San

17   Francisco coho be lumped in with the rest of the CCC ESU, and may in fact militate against such

18   lumping.  Again, insofar as genetic data is concerned, NMFS might have defined a salmon ESU on

19   the scale of a single lake or river, as it has done elsewhere,[15] rather than lumping numerous rivers

20   together with arbitrary geographic boundaries between them.

21    In light of this concrete and specific factual context, and the larger policy context, it is

22   remarkable to see NMFS asserting that it "lacks the authority to exclude genetically similar" coho

23   from the CCC ESU.  (Dfts. Mem. 23.)  It is axiomatic that "an order may not stand if an agency has

24   misconceived the law", *SEC v. Chenery*, 318 U.S. 80, 94 (1947), and defendants' misconception of

25   their legal duty alone supports overturning their rejection of the Petition.  Without bright-line

26

27   [15]*See, e.g.,* 56 Fed. Reg. 58,619 (Nov. 20, 1991) (listing sockeye salmon "ESU" whose "current
     production is limited to Redfish Lake in the Salmon River Basin, Idaho").

28

1  scientific distinctions (as in the case of full species which cannot interbreed with other species), the

2  question where to draw ESU boundaries calls for the exercise of scientific and policy discretion,

3  and defendants should be ordered to exercise that discretion in a status review.

4  <center>**Conclusion**</center>

5       Plaintiff is not asking this Court to set aside the coho listing.  All that plaintiff asks is a

6  finding, as a matter of law, that plaintiff has met the minimal threshold of acceptance of his Petition,

7  so that defendants can consider the issues raised in accordance with the public process required by

8  the ESA.

9       DATED:  October 31, 2008.

10       Respectfully submitted,

11

12       */s/  James L. Buchal*
   James L. Buchal OSB #92161

13  Attorney for Plaintiff, *Pro Hac Vice*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PAGE 30:   PLAINTIFF'S COMBINED OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY
          JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
          Case No. 08-CV-1592-RMW

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on October 31, 2008, I electronically filed the foregoing **"**PLAINTIFF'S COMBINED OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT" with the Clerk of Court using the CM/ECF system which will automatically send email notification to the following attorney of record:

Robert.p.williams@usdoj.gov.

*/s/ Carole A. Caldwell*